**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| WILLIAM DOUGLAS YOUNG and | ) | Case No. 10-11338 |
| MARTHA HEATH YOUNG | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| WALTON HOLDING OF NC, LLC | ) | Adv. No. 11-2003 |
| | ) | |
| Plaintiff | ) | |
| vs. | ) | |
| | ) | |
| WILLIAM DOUGLAS YOUNG | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**

This matter came before the Court on July 24, 2012 for trial upon the complaint by Walton Holding of NC, LLC ("Walton") for a determination that Walton's claim against William Douglas Young ("Young") is not dischargeable pursuant to Sections 523(a)(2) and 523(a)(6) of the Bankruptcy Code. Gerald S. Schafer appeared on behalf of Walton and James K. Talcott appeared on behalf of Young. For the reasons explained below, the Court will deny the relief requested by Walton.

**I. JURISDICTION**

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I), which this Court has the jurisdiction to hear and

determine. Pursuant to the analysis in Stern v. Marshall, 564 U.S. --, 131 S. Ct. 2594 (2011), the Court may enter a final order in this matter.

## II. FACTS

Young was the Registered Agent and Principal Officer of Live Cargo, Inc., a North Carolina Corporation in the business of software programming. From April 2004 until December 2009, Live Cargo leased 4,080 square feet of office space located at 6520 Airport Center Parkway, Greensboro, North Carolina from Walton.[1] In September 2007, Live Cargo defaulted under the lease by failing to make its monthly rent payments. Day Atkins, the owner of Walton, attempted to work with Young and Live Cargo, frequently accepting partial and late rent payments. On December 19, 2008, Young executed a Lease Guarantee Agreement with Walton to guarantee the obligations of Live Cargo under the lease. The Agreement also included a payment schedule to catch up Live Cargo's arrearage under the lease. From January to July of 2009, Live Cargo made only four payments under the lease.[2] By July 2009, Live Cargo owed Walton more than $100,000 in unpaid rent, not including late fees and other penalties. Despite Live Cargo's repeated and continued default under the lease, Walton continued to accept partial payments in reliance on Young's promise that he would catch up the rent, if given a little more time to acquire clients and contracts overseas.

In December 2009, several of Walton's employees who worked in the Airport Center offices informed Atkins that Live Cargo appeared to have ceased doing business–the parking lot was emptier than usual, and few Live Cargo employees had been observed entering and exiting the

---

[1] Specifically, Live Cargo leased the entire lower level of a building comprising of Suites 102, 104, and 106. Walton maintains an office on the second floor of the same building.

[2] In April 2009, Walton requested that Live Cargo vacate the building but never initiated eviction proceedings.

building for several days.³  Atkins contacted his attorney, who advised him to change the locks on the Live Cargo offices and claim a lien pursuant to North Carolina General Statute § 44A-2(e).⁴  On December 23, 2009, although the lease had not expired and Walton had not terminated it, Atkins caused a locksmith to change the locks on the Live Cargo offices.  He also walked through the suites leased by Live Cargo, although he did not inventory or photograph any of the items in the offices.

On January 4, 2010, Atkins met Betty Smith⁵ at the Live Cargo offices and escorted her into

---

³ Betty Smith, Young's sister, and Live Cargo's officer manager, testified that she worked in the Live Cargo offices on December 21-22, catching up on accounting, calling customers, and invoicing.  However, most of Live Cargo's employees had left by that time because the company could no longer afford to make payroll.

⁴ N.C.G.S. § 44A-2(e) provides:

> Any lessor of nonresidential demised premises has a lien on all furniture, furnishings, trade fixtures, equipment and other personal property to which the tenant has legal title and which remains on the demised premises if (i) the tenant has vacated the premises for 21 or more days after the paid rental period has expired, and (ii) the lessor has a lawful claim for damages against the tenant. If the tenant has vacated the premises for 21 or more days after the expiration of the paid rental period, or if the lessor has received a judgment for possession of the premises which is executable and the tenant has vacated the premises, then all property remaining on the premises may be removed and placed in storage. If the total value of all property remaining on the premises is less than one hundred dollars ($100.00), then it shall be deemed abandoned five days after the tenant has vacated the premises, and the lessor may remove it and may donate it to any charitable institution or organization. Provided, the lessor shall not have a lien if there is an agreement between the lessor or his agent and the tenant that the lessor shall not have a lien. This lien shall be for the amount of any rents which were due the lessor at the time the tenant vacated the premises and for the time, up to 60 days, from the vacating of the premises to the date of sale; and for any sums necessary to repair damages to the premises caused by the tenant, normal wear and tear excepted; and for reasonable costs and expenses of sale. The lien created by this subsection shall be enforced by sale at public sale pursuant to the provisions of G.S. 44A 4(e). This lien shall not have priority over any security interest in the property which is perfected at the time the lessor acquires this lien.

⁵Smith testified that Young was seriously ill with bacterial pneumonia during December 2009 and January 2010, and that she handled all communications and meetings with Atkins during that time.

the building. What happened next is not clear based on the evidence presented at trial. According to Smith, Atkins notified her that Live Cargo had forty-eight hours to vacate the office suites. Smith testified that she and Atkins identified property in the offices that needed to be packed and removed and that she identified other items that were the personal property of either Young or other Live Cargo employees–in other words, property that was not the property of Live Cargo and therefore not subject to Walton's lien. Live Cargo had encouraged its employees–mainly software programmers–to bring personal items to work in order to promote creativity and productivity.[6] These items included, but were not limited to, a foosball table, couches, a basket ball hoop, and an exercise bike. Other office furniture, including framed art, filing cabinets, upholstered furniture, and a small refrigerator, was purchased personally by Young but used in the Live Cargo offices. Atkins testified, by contrast, that he never authorized Smith to remove <u>any</u> items other than those in Young's top desk drawer, and indeed had "extensive discussions" with Smith about the importance of not removing any property from the Live Cargo offices.

The evidence of what transpired on January 5, 2010 is also unclear. Atkins testified that on January 5 he received a call from Smith. According to Atkins, Smith requested access to the Live Cargo offices in order to dispose of sensitive employee records and to complete some computer-related work. Although Atkins refused to give Smith a key to the building, he arranged to have a Walton employee let her into the Live Cargo offices. Smith allegedly promised not to remove anything other than the employee records. Smith, by contrast, testified that she arrived at the Live Cargo offices on the morning of January 5 with the understanding that she was not only to dispose

---

[6]Smith testified that programmers frequently require a "creative outlet" in order to solve coding problems. Some of the programmers at Live Cargo would run around the office park to clear their heads, while others preferred to play games. Programmers would sometimes work late hours or even sleep at work when facing deadlines. Live Cargo therefore encouraged its employees to bring couches, recliners, and other furniture into the office.

of the employee records but also begin packing. On January 5, Smith placed an order with Two Men & a Truck Moving Company and scheduled the movers for January 12, 2012. Smith testified that Atkins knew that she had hired a moving company. Smith spent January 5-6 sorting papers, invoicing clients, and packing. On the morning of January 12, Two Men & a Truck Moving Company parked a large moving truck in front of the Live Cargo offices and began loading furniture and other office equipment into the truck for delivery to storage. That morning, as on other mornings, one of Walton's employee's unlocked the Live Cargo offices for Smith, and that evening a Walton employee locked the offices after her when she left.

Walton had been in contact with Vencore Solutions, LLC, an Oregon corporation with a perfected security interest[7] in Live Cargo's machinery, equipment, and personal property, regarding Live Cargo's business operations since it changed the office locks on December 23, 2009. Although Vencore had a perfected security interest in all of the equipment, personal property, furniture, and fixtures at the Live Cargo offices, Vencore informed Walton that it was only interested in retaining an interest in Live Cargo's electronic and technology equipment. Vencore indicated that it was interested in selling its interest in the remaining Live Cargo personal property to Walton. On or around January 13, 2010, Atkins met a representative from Vencore at the Live Cargo offices. Atkins testified that when he entered the offices with the Vencore representative on January 13, many items he had observed on his December 23 post-lockout walkthrough were missing. Specifically, Atkins noted that the walls, which formerly had a "smattering of framed pictures," were

---

[7] On June 30, 2009, Live Cargo executed a security agreement and financing statement with Vencore Solutions in which it granted a lien on all machinery, equipment, and personal property (including equipment, machinery, tools, furniture, fixtures, tolls, supplies, inventory, and general intangibles) located at 6520 Airport Center Drive, Suite 102, Greensboro, North Carolina. Vencore filed the financing statement with the North Carolina Secretary of State on July 2, 2009.

bare. The kitchen cabinets, formerly "filled with china," were empty. Several small appliances, including a microwave, small refrigerator, and espresso machine, were also gone. Most conspicuously, Atkins has recalled seeing a foosball table in one of the Live Cargo meeting rooms when he walked through the offices in December, which was not there when he walked through the space on January 13. Walton purchased the items that remained in the Live Cargo offices from Vencore for $2,150.

Walton filed a complaint for a determination of nondischargeability, seeking actual damages in the amount of $20,000, which Walton requests be determined to be nondischargeable under Section 523, plus attorneys fees and costs. The Complaint consists of two counts. Count One asserts a cause of action against Young for obtaining property from Walton by false pretenses, false representations, or actual fraud pursuant to Section 523(a)(2)(A). Count Two seeks a determination of nondischargeability under Section 523(a)(6) for willful and malicious injury by Young to Walton and Walton's property.

### III. ANALYSIS

In order for this court to declare a debt nondischargeable under Section 523(a)(2)(A), Walton must demonstrate that Young obtained money, property or services by false pretenses, false representation, or actual fraud. In re Showalter, 86 B.R. 877, 880 (Bankr. W.D. Va., 1988) (citing In re Criswell, 52 B.R. 184, 196 (Bankr. E.D. Va.1985)). The elements comprising false representation under are: (1) the debtor made a representation; (2) the debtor knew the representation was false at the time it was made; (3) the debtor intended to deceive the creditor at the time the debtor received the money; (4) the creditor relied on the representation; and (5) the creditor sustained a loss as a result of that reliance. Id. Walton's second cause of action asserts a claim against Young under Section 523(a)(6) for a "willful and malicious" injury. In order to be

successful under this subsection, Walton must prove, by a preponderance of the evidence, the existence of "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." In re Robbins, 2007 WL 1174334, *10 (Bankr. E.D. Tenn. April 19, 2007) (citing Kawaauhau v. Geiger, 118 S.Ct. 974, 977 (1998)). In other words, Young must have either desired to cause the consequences of his actions, or he believed with reasonable certainty that such consequences would occur. Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 464 (6th Cir.1999); Guthrie v. Kokenge (In re Kokenge), 279 B.R. 541, 543 (Bankr. E.D. Tenn. 2002). The burden of proof in any Section 523 proceeding is on the plaintiff, and the standard of proof is by a preponderance of the evidence. In re Showalter, 52 B.R. at 880 (citing Combs v. Richardson, 838 F.2d 112 (4th Cir. 1988)).

In order to prevail under either Section 523(a)(2)(A) or Section 523(a)(6), Walton must show that it had an interest in Live Cargo's personal property. Walton asserts a statutory lien on personal property pursuant to North Carolina General Statute § 44A-2(e). Under North Carolina law,

> Any lessor of nonresidential demised premises has a lien on all furniture, furnishings, trade fixtures, equipment and other personal property to which the tenant has legal title and which remains on the demised premises if (i) the tenant has vacated the premises for 21 or more days after the paid rental period has expired, and (ii) the lessor has a lawful claim for damages against the tenant.

N.C. Gen. Stat. § 44A-2(e).

Although the paid rental period had clearly expired by December 23, 2009–Live Cargo had not paid the rent since July–Walton presented no evidence that Live Cargo had vacated the office suites at 6520 Airport Center Parkway. Although Walton's employees told Atkins that the Live Cargo parking lot had been emptier than usual in December, Smith testified that she worked in the Live Cargo offices on December 21-22. Sensitive employee records and important personal items–including Young's checkbook–remained in the offices. Although most of its employees had

left in November 2009, there is no evidence that Live Cargo had vacated its offices, let alone vacated them for twenty-one days at the time that Walton changed the locks. Walton therefore cannot satisfy the first element required to claim a statutory lien on personal property under N.C. Gen. Stat. § 44A-2(e) and has no cognizable interest in Live Cargo's property. Without such an interest, Walton has no basis to bring an action for nondischargeability under Section 523.

Even if Walton had a valid lien on December 23, 2009, under N.C. Gen. Stat. § 44A-2(e), that lien could extend only to personal property in which Live Cargo had legal title. The evidence reflects that the items removed from the Live Cargo offices were owned by Young and other Live Cargo employees, not Live Cargo. Smith testified extensively, without contradiction, as to the origin and owner of each item removed from the office.

Furthermore, the Court concludes that Smith's version of the facts is more credible. Smith's testimony is supported by the fact that she caused the items to be removed during the daylight hours of December 12 in plain view of the Walton employees who worked on the second floor of the same building, and who were observant enough to notice the comings and goings of Live Cargo employees. The moving truck was parked for seven hours in front of the building–in the same lot used by the Walton employees. It strains credulity to believe that Walton's employees observed neither the moving truck parked in front of their building, nor the seven hour moving process itself. If they had, and if Smith truly had no permission to remove the items, the employees presumably would have confronted Smith or, at the very least, notified Atkins.

Walton has not satisfied the elements required to establish a lien under N.C. Gen. Stat. § 44A-2(e). Live Cargo had not vacated the premises on December 23, 2009. Moreover, the evidence reflects that the items removed from the Live Cargo premises were owned by Young and other Live Cargo employees, not Live Cargo, and that Smith had permission to remove them. Without a legal

interest in the property removed from the offices, Walton has no basis to assert a claim under Section 523. Walton has failed to carry its burden to demonstrate false pretenses, false representations, or actual fraud under Section 523(a)(2)(A). Walton's second theory of nondischargeability under Section 523(a)(6) fails because Walton has no lien on Live Cargo's personal property and because Walton failed to carry its burden of showing willful and malicious injury. For these reasons, Walton was not damaged by Young's removal of the property from the Live Cargo offices and may not recover under Section 523. Because Walton suffered no damages as a result of Young's actions, there is no nondischargeable debt, and judgment will be entered in favor of Young.

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.